UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JENNIFER MENGHI,

                      Plaintiff,                            **MEMORANDUM**
                                                        **AND ORDER**

        -against-                                CV 02-1085 (WDW)

POLICE OFFICER TEDDY HART, individually
and in his official capacity, and COUNTY OF
SUFFOLK,

                        Defendants.
------------------------------------------------------------X
**APPEARANCES**:

**Daniel F. De Vita, Esq.**
Attorney for Plaintiff
377 Oak Street, Suite 310
Garden City, New York, 11530

**Richard W. Young, Esq.**
**Young & Young**
Attorney for Defendant Teddy Hart
863 Islip Avenue
Central Islip, New York 11722

**Arlene S. Zwilling, Esq.**
**Office of the Suffolk County Attorney**
Attorney for Defendant County of Suffolk
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788

**WALL, Magistrate Judge:**

       Plaintiff Jennifer Menghi commenced this action against defendants Teddy Hart ("Hart"),

in both his individual and official capacities, and the County of Suffolk ("the County"), alleging

violations of her civil rights pursuant to 42 U.S.C. §1983 ("§1983") and violations of the

Drivers' Privacy Protection Act ("DPPA"), 18 U.S.C. §2721 *et seq.*   A jury found in favor of

plaintiff on her DPPA claims and awarded both compensatory and punitive damages. Before the court are motions from both defendants for judgment as a matter of law pursuant to Rule 50 (b) of the Federal Rules of Civil Procedure, or for a new trial pursuant to Rule 59. *See* County's Motion, Docket Entry ("DE") [170]; Hart's Motion, DE [172]. In the alternative, both defendants argue that the compensatory damages award is excessive, and defendant Hart further seeks a reduction in the punitive damages award. Plaintiff has moved for an award of reasonable attorneys' fees and costs. DE [166]. For the reasons set forth herein, the Rule 50 motions are denied, the Rule 59 motions are granted in part and denied in part, and the motion for attorneys' fees and costs is granted in part and denied in part.

## BACKGROUND

Familiarity with the underlying facts of this case and the previous orders of the court is assumed. In brief, plaintiff was arrested by defendant Hart, who was then a Suffolk County police officer, for driving under the influence on August 3, 1996. Subsequent to that lawful arrest, plaintiff received harassing and threatening anonymous phone calls at her home on several dates from February 1997 to January 2000. Plaintiff lodged complaints with the police, and as the result of an Internal Affairs Bureau ("IAB") investigation, Hart was identified as the caller to Menghi and to several other women. The IAB investigation further discovered that Hart had accessed the police computers to run plaintiff's license plate through DMV on three occasions prior to her arrest. Those searches took place twice on August 3, 1995 and once on January 31, 1996. Hart resigned from the police department and pled guilty to charges of aggravated harassment, computer trespass, and official misconduct.

The complaint initially filed by Menghi on February 15, 2002, contained a claim under

§1983. She subsequently moved to amend her complaint to add the claims under the DPPA and a claim for liability against the County under *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658 (1978). On July 27, 2004, I issued a report recommending that the motion be granted. DE [53].[1] That report recommended a finding, *inter alia,* that plaintiff's claims under the DPPA were subject to a four-year statute of limitations and were not time barred. By Order dated September 13, 2004, Judge Seybert, noting that no objections had been filed, adopted the report and recommendation. Order, DE [59].

By Memorandum and Order date March 14, 2007, Judge Seybert granted in part and denied in part the County's motion for summary judgment, and denied both Hart's motion and plaintiff's cross-motion for summary judgment. ("SJ Order"), DE [119]. Of particular note, Judge Seybert found that a municipality may be held vicariously liable under the DPPA. SJ Order at 18. In addition, Judge Seybert rejected Hart's motion based on an argument that the DPPA claims were time barred, stating that the earlier ruling on the statute of limitations issue was binding on the parties. SJ Order at 9. Finally, Judge Seybert found that there were disputed issues of fact "as to whether Hart did in fact obtain Plaintiff's personal information from a state motor vehicle agency prior to and during her arrest." SJ Order at 17. None of the parties sought reconsideration of Judge Seybert's SJ Order.

In March 2008, the parties consented to my jurisdiction for all purposes. After a jury trial conducted in October 2008, the jury found in favor of plaintiff Jennifer Menghi on her claims under the DPPA, but found for the defendants on her claims pursuant to §1983. The jury responded "Yes" to the following questions on the Verdict Sheet regarding plaintiff's DPPA

---

[1]The parties did not consent to my jurisdiction for all purposes until March 2008.

claim:

> 4. Did plaintiff Menghi prove that defendant Hart obtained, disclosed or used plaintiff's personal information obtained from a DMV record?

> 5. Did plaintiff Menghi prove that defendant Hart's obtaining, disclosing or using plaintiff's personal information obtained from a DMV record was for an impermissible purpose?

> 6. Did plaintiff Menghi prove that defendant Hart was acting within the scope of his employment when he obtained, disclosed or used plaintiff's personal information obtained from a DMV record for an impermissible purpose?

The jury awarded plaintiff $1,000,000 in compensatory damages. In addition, it awarded $2,000,000 in punitive damages against Hart.

The County defendant now moves for judgment as a matter of law with respect to the following: 1) the finding of municipal vicarious liability under the DPPA, 2) the finding that Hart was acting within the scope of his employment, 3) any claim regarding Hart's appearance at plaintiff's place of work is time barred, and 4) no evidence to show plaintiff suffered from Graves' disease. Defendants also move for a new trial, or alternatively, a remittitur of the damages awards.

## DISCUSSION

### I.     Legal Standards

As permitted by Rule 50 (b), both the County and Hart have renewed their motions for judgment as a matter of law made prior to verdict. "In ruling on a motion for judgment as a matter of law, a district court must consider the evidence in the light most favorable to the non-movant and draw all reasonable inferences the jury could have drawn." *Cweklinsky v. Mobil*

4

*Chem. Co.,* 364 F.3d 68, 75 (2d Cir. 2004). Additionally, "[a] jury verdict should be set aside only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" *Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 79 (2d Cir. 2006) (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir. 1992) (ellipsis in original) (quotations omitted)). In evaluating the motion, the court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir.1988)). It is enough that this testimony was in evidence for the jury to consider. Defendants' liability turns on the jury's credibility determinations, which the Court "cannot disturb" unless the verdict was "egregious." *See James v. Melendez,* 567 F. Supp. 2d 480, 484 (S.D.N.Y. 2008) (citing *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998)).

Rule 59 allows the court to grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59 (a)(1)(A). This standard is "less stringent" than that required for relief under Rule 50. *Olsen v. County of Nassau,* 615 F. Supp. 2d 35, 39 (E.D.N.Y. 2009). "In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion is less onerous for the moving party in two ways: first, '[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.' Second, in deciding a Rule 59 motion 'a trial judge is free to weigh the evidence himself, and need not view it in the

5

light most favorable to the verdict winner.'" *Ramos v. County of Suffolk,* --- F. Supp. 2d ----,

2010 WL 1641454, at *6 (E.D.N.Y.,Apr. 26, 2010) (*quoting DLC Mgmt. Corp.,* 163 F.3d at

134).  While the court may independently weigh the evidence, a motion for a new trial should

only be granted if the court is convinced that the jury reached a seriously erroneous result or that

the verdict is a miscarriage of justice and that the verdict is against the weight of the evidence.

*Manley v. AmBase Corp.,* 337 F.3d 237, 244-45 (2d Cir. 2003) (citations omitted).

　　　　The jury found that Hart, while acting within the scope of his employment, obtained,

disclosed or used plaintiff's personal information obtained from a DMV record for an

impermissible purpose.  The DPPA provides, in pertinent part, that "[a] person who knowingly

obtains, discloses or uses personal information from a motor vehicle record, for a purpose not

permitted under this chapter shall be liable to the individual to whom the information pertains."

18 U.S.C. §2724(a).  A "person" under the statute "means an individual, organization or entity,

but does not include a State or agency thereof."  18 U.S.C. §2725(2).  "Personal information" is

defined by the statute as "information that identifies an individual, including an individual's

photograph, social security number, driver identification number, name, address (but not 5-digit

zip code), telephone number, and medical or disability information. " 18 U.S.C. §2725(3).

## II.  Defendant Suffolk County's Rule 50 Motion

　　　　The County raised four arguments in support of its Rule 50 motion: that it cannot be held

vicariously liable for Hart's violations of the DPPA, that Hart was not acting within the scope of

his employment, that any claim regarding Hart's unwanted appearance at plaintiff's workplace is

time barred, and that plaintiff provided no evidence that she has Graves' disease.  I will address

these arguments in turn.

A.  Vicarious Liability under the DPPA

The County argues that the DPPA does not allow for a finding of vicarious liability based on respondeat superior, but rather urges adoption of a *Monell*-type rule allowing an imposition of liability on its part only where plaintiff has established a custom, policy, or practice within the County.  It further argues that the case relied upon by Judge Seybert in her order denying summary judgment, *Margan v. Niles,* 250 F. Supp. 2d 63 (N.D.N.Y. 2003), was "incorrectly decided."  County's Mem. at 3.

This issue was previously raised by the County in its motion for summary judgment.  In the SJ Order issued on March 14, 2007, DE [119], Judge Seybert found that "a municipality may be held vicariously liable under Section 2724" of the DPPA. SJ Order at 18.  "The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.,* 254 F.3d 403, 410 (2d Cir. 2001) (citations omitted).  Courts apply this doctrine when "their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." *Id.* (citations omitted).  Application of this doctrine is discretionary and does not limit the court's power to review its decisions prior to final judgment. *Id.; McAnaney v. Astoria Fin. Corp.,* 665 F. Supp. 2d 132, 142 (E.D.N.Y. 2009).  Here, the County has presented no new argument to persuade the undersigned to exercise that discretion and essentially reverse the opinion of Judge Seybert on this crucial issue.

Although the County has not presented any new argument, the court conducted further research regarding application of the DPPA.  While case law interpreting the DPPA is sparse, research has not discovered any case in which a court has applied a *Monell*-type standard.  To the

contrary, the *Margan* case makes a compelling argument that use of a *Monell* standard is not appropriate in the context of a DPPA case. The *Margan* court noted that the consideration of whether a municipal policy existed is necessary in §1983 cases "because, *unlike ordinary tort litigation,* the doctrine of respondeat superior [is] inapplicable." *Margan,* 250 F. Supp. 2d at 75 (emphasis in original) (quoting *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 122 (1992)). It concluded that "the DPPA is more akin to an ordinary tort than an action pursuant to section 1983 (which requires conduct under 'color of state law'), and therefore, analogy to section 1983 principles of liability is inappropriate." *Id.* The court further noted that in formulating the DPPA, "Congress carefully defined the term 'person'" to exclude states and state agencies, but not municipalities. Thus, "Congress's decision not to exclude municipalities evinces its intention to put municipalities on the same footing as all other 'persons.'" *Margan,* 250 F. Supp. 2d at 75, n.15.

Additionally, research has found no case in which a court has expressly declined to impose vicarious liability on a municipality in a DPPA case. The Seventh Circuit, however, left undisturbed a jury's finding that a municipality was liable for the actions of its police officer who searched DMV records and disclosed plaintiff's address to her ex-husband in violation of the DPPA. *See Deicher v. City of Evansville, Wis.,* 545 F.3d 537 (7th Cir. 2008) (reversing trial court on procedural grounds and new trial on damages ordered), *cert. denied* 129 S. Ct. 1355 (2009). Thus, for the reasons stated in the SJ Order dated March 14, 2007 and in *Margan,* I find that use of a vicarious liability standard was not erroneous.

B. Scope of Employment

The County next argues that Hart's violations of the DPPA "were beyond the scope of his

8

employment as a matter of law." County's Mem. at 4. It argues that the evidence established "that the DPPA violations, particularly the obscene phone calls, were completely unrelated to Hart's employment or any police business," that he never identified himself as a police officer, and that three of the four calls were made while he was off duty. *Id*. The County further argues that the jury's determination that Hart was not acting under color of law when making the calls "was irreconcilable with the finding that he was acting within the scope of his employment." *Id* at 8.

Contrary to the County's assertions, there was no explicit finding by the jury that Hart was acting within the scope of his employment when he made the offensive telephone calls. The jury specifically found that Hart was "acting within the scope of his employment when he obtained, disclosed or used plaintiff's personal information obtained from a DMV record for an impermissible purpose." Verdict Sheet question 6. In determining whether Hart was acting within the scope of his employment, the jury was instructed that it could consider such factors as "the connection between the time, place and occasion for the act; the history of the relationship between defendant Hart and defendants Suffolk County as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the defendant Suffolk County could reasonably have anticipated." Trial Transcript ("Tr.") at 812-13.[2] A greater emphasis may be placed on the final factor – whether the acts "could reasonably have been anticipated by the employer." *Mingo v. United States,* 274 F. Supp. 2d 336, 346 (E.D.N.Y.). There was evidence

---

[2]Although the County argues that these factors should not be applied in a case involving federal law, *see* County Reply Mem. at 2, it posed no objection to this language at the charging conference.

as to several of these factors, including the final one, that supports a finding that Hart was acting within the scope of his employment.

Lieutenant Peter Cilento testified that on both August 3, 1995 and January 31, 1996, defendant Hart, while on duty, ran plaintiff's plate from a computer within the Sixth Precinct. Tr. 276-77. Hart did not have his own computer access code, *id.* 242, but rather used a code he found written on the computer. *Id.* 250. Hart stated that at some point, that password stopped working so he started counting backwards until he hit upon a number that worked. *Id.* 418. Lieutenant Cilento noted that the computer recognized valid codes even if the authorized user for that code did not input it. *Id.* 244-45. As evidenced by several documents, the police department was aware of the practice of leaving passwords on computers and unauthorized access to computers and issued warnings about it. Exs. D, F, O, P; Tr. 301. There was no evidence that the police department performed any follow-up or used any other precautions to ensure that it's warnings about unauthorized computer use were heeded. From 1990 to his resignation, Hart performed almost 2000 computer runs, some were for legitimate police reasons, some were not. Tr. 247-48. Hart was never instructed not to make computer runs. *Id.* 381. This evidence clearly supports a finding that although he was not authorized to do so, Hart commonly performed computer searches for both legitimate and illegitimate purposes, and that the County not only anticipated that its officers might perform unauthorized searches, but was aware that such searches were being conducted. Thus there was sufficient evidence for the jury to conclude that Hart was acting within the scope of his employment when he accessed the DMV records to obtain plaintiff's address and other information.

In addition, the jury was specifically instructed that "as a matter of law, the obtaining of

the plaintiff's DMV records at the time of her arrest was permissible under the DPPA. However, it is for you, the jury, to determine whether the defendant Hart subsequently used the information permissibly obtained at the time of the arrest for a later impermissible purpose." Tr. 810-11. There was evidence that would support a jury finding that Hart obtained Menghi's personal information during the arrest from her driver's license rather than from Menghi herself during an interview. Menghi testified that Hart took her license when he first approached her car during her arrest, and that it was not returned to her until the next day. *Id.* 435. There was also testimony that Menghi's address and plate number were recorded on a notepad kept by Hart, *id.* 348 and Ex. 10, and Hart acknowledged that the information could have come from a DMV record, Tr. 365, or could have been written the night of her arrest. *Id.* 380. I find that there was also evidence for the jury to find that Hart used the information permissibly obtained at the time of the arrest for a later impermissible purpose.

The County also argues that the jury's finding that Hart was acting within the scope of his employment is inconsistent with its finding that he was not acting under color of state law when he approached her at her workplace and/or made telephone calls to her. The court disagrees. Whether actions are performed "in the scope of employment" is a different inquiry as to whether those acts were made "under color of state law" for §1983 purposes. Indeed the question of whether an off-duty police officer was acting within the scope of his employment is cited as a factor in determining whether that person was acting under color of state law. *See, e.g., Steptoe v. City of Syracuse,* 2010 WL 1257936, at *1 (N.D.N.Y., Mar. 25, 2010); *Claudio v. Sawyer,* 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009). Defendant has not established that the verdict was inconsistent as a matter of law.

C. Hart's Appearance at Plaintiff's Workplace

The County argues that plaintiff is barred from any recovery related to Hart's "unwanted appearance" on August 6, 1996 at the P.C. Richard store where plaintiff worked. It claims that no DPPA violation can be found for this encounter since DMV records do not contain work information and thus "Hart's obtaining of her workplace address was utterly disconnected with DMV records." County Mem. at 9. In the alternative, the County claims that any DPPA claim relating to that encounter would be barred by the four year statute of limitations.

The court is frankly at a loss in assessing the import of this argument. The jury was not asked to pass upon enumerated violations of the DPPA,[3] and as discussed *supra,* there was ample evidence to support the finding that Hart obtained plaintiff's personal information for an impermissible purpose in violation of the DPPA by running her plates in August 1995 and January 1996 or by misusing information taken from her driver's license during her arrest. Thus, even if the County's argument is correct that the workplace encounter was not, by itself, a violation of the DPPA, it would not result in an order vacating the jury's verdict.

The County also argues that any DPPA violation that occurred by way of the workplace encounter was time barred. I previously found that plaintiff's DPPA claims were not barred by the statute of limitations in the Report and Recommendation regarding amendment of the complaint, and Judge Seybert adopted those findings. Significantly, the County did not object to the R&R, nor did it ask Judge Seybert to reconsider her Order. When Hart attempted to raise statute of limitations under the DPPA at the summary judgment stage of these proceedings, Judge

---

[3]There was no objection to the liability portion of the Verdict Sheet raised by any party on this ground. As will be discussed *infra,* the County belatedly asked that the jury be instructed to assess *damages* by incident.

Seybert found that this issue had been previously decided and was binding on the parties. SJ Order at 8-9. Although its arguments are not clear and completely lack legal authority, the County is now belatedly attempting to parcel out Hart's conduct at P.C. Richard as a discrete act subject to its own statute of limitations. Implicitly understanding that this argument should have been raised earlier, the County argues that at the time of my Report and Recommendation ("R&R"), it did not have all the "facts" regarding the workplace encounter since it only learned at Menghi's deposition on June 18, 2004 that she had recognized Hart during the meeting. County Reply Mem. at 4-5. The obvious flaw to this argument is that the R&R is dated July 27, 2004, over a month *after* the plaintiff's deposition at which the County learned this fact, and thus the County was free to raise the argument either as a supplement to its opposition to the motion to amend or as an objection to the R&R.

### D. Admissibility of Evidence of Graves' Disease

The County claims that Menghi cannot recover any damages attributable to her having Graves' disease since none of her treating physicians testified about this condition and none of her medical records were introduced into evidence at trial. While the County acknowledges that Dr. David Rosenthal, an endocrinologist, testified as an expert regarding plaintiff's Graves' disease and that his opinion was admissible under Rule 703 of the Federal Rules of Evidence, it argues that Dr. Rosenthal's expert opinion does not constitute "competent, substantive evidence that she did actually have Graves' disease." County Mem. at 10.

Dr. Rosenthal's opinion was clearly admissible under FRE 703, which provides that "[t]he facts or data in the particular case upon which an expert bases an opinion . . . need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703.

The introduction of Dr. Rosenthal's opinion into evidence without admission of plaintiff's medical records goes to the weight of the evidence "and did not preclude a jury from finding causation and awarding some level of damages based on such evidence." *Yin Wang v. Yum! Brands, Inc.,* 2008 WL 428669, at *3 (E.D.N.Y. Feb. 14, 2008) (medical expert's opinion alone could form basis of jury award of damages). Defendants did not offer any witnesses to dispute the testimony introduced by plaintiff. Additionally, during the charging conference, neither defendant requested the addition of any language regarding the weight of the evidence regarding plaintiff's Graves' disease.

Dr. Rosenthal testified that Graves' disease is an autoimmune disorder that results in an overactive thyroid. Tr. 43. It has a genetic component, *id.* 48-49, and the onset of the disorder correlates with stressful life experiences. *Id.* 51. Dr. Rosenthal concluded the Menghi was diagnosed with Graves' disease, *id.* 53, and that Hart's conduct "was a substantial factor in precipitating the onset of Graves' disease." *Id.* 56:17-18. He never examined plaintiff, and based his opinion on the review of medical records including laboratory reports, blood test reports, nuclear medicine reports, records from Dr. Wu and Dr. Narula, hospital records from Stony Brook, plaintiff's deposition testimony and affidavits, and reports from plaintiff's psychologist, Dr. Abramson. *Id.* 52. Menghi testified that she was diagnosed with Graves' disease in 2006. *Id.* 505. She also spoke extensively about the lingering effects on her resulting from Hart's conduct. For example, she doesn't go out alone at night, goes to the gym only with her husband, has a limited social life, has an alarm system but checks it all the time, and is petrified of police cars and police men. *Id.* 483-86. Although she testified about stress related to the end of her first marriage in 2003 including an incident of assault, she also stated that the

stress went away when she ended that relationship in March 2003. *Id.* 501. To the contrary, her stress related to the threatening phone calls and the discovery that the perpetrator was a police officer has continued.

Dr. Abramson, her treating psychologist, also testified that over the course of his treatment of Menghi, the "primary stressor" in her life was the "traumatic experience with harassing phone calls from Police Officer Hart over several years." Tr. 153:8-10. He stated that her fears of police and of being alone, had nothing to do with the incident of assault by her first husband, *id.* 190, and that even after this incident, the primary source of her distress was the threatening phone calls. *Id.* 192.

Menghi's testimony and Dr. Rosenthal's testimony provided a sufficient basis for the jury to find that Menghi has Graves' disease, that Hart's conduct contributed to her condition, and to award damages to her. Dr. Abramson's testimony provided additional support for a finding that Hart's conduct was a substantial stressor leading to the onset of plaintiff's Graves' disease. I find that there was sufficient evidence for the jury to consider concerning plaintiff's Graves disease. Accordingly, defendant's motion is denied.

### III. Defendant Hart's Rule 50 Motion

Defendant Hart claims that the verdict was against the weight of the evidence in that there was no evidence proving that he obtained plaintiff's information from an unauthorized DMV search, and that the weight of the evidence proves that the information was collected pursuant to a lawful arrest. To prove her case, plaintiff had to establish that defendant Hart obtained, disclosed or used personal information from a motor vehicle record for an impermissible purpose. Plaintiff's theory of the case was that defendant Hart obtained her address from her

15

DMV records when he ran her license plate in August 1995 and January 1996, or from her license which she produced incident to her arrest in August 1996, and using that information, was able to look up her telephone number and place the harassing phone calls. I must draw all reasonable inferences that the jury could have drawn, and conclude that there was enough evidence to support the jury's verdict in plaintiff's favor.

Lieutenant Cilento testified that Hart, while on duty, ran plaintiff's plate through DMV on three occasions on August 3, 1995 and January 31, 1996. Plaintiff introduced as evidence a list of computer runs performed for her license plate on those dates. Ex. 9. There was no testimony that these computer runs to obtain plaintiff's DMV records were for a permissible purpose, nor was there any suggestion that plaintiff was involved in any official police encounters prior to her arrest. Defendant Hart also took her driver's license and ran her plates incident to her arrest during a traffic stop on August 3, 1996. The jury was instructed that this particular obtaining of DMV information was for a permissible use and that the obtaining was not a violation of the DPPA as a matter of law. Tr. 810. The jury was further instructed, however, that it was "to determine whether the defendant Hart subsequently used the information permissibly obtained at the time of plaintiff's arrest for a later impermissible purpose." *Id.* 810-11. As discussed *supra,* Hart had access to Menghi's license incident to the lawful traffic stop and arrest, and may have recorded her personal information from that document.

Thus, there was evidence of Hart's accessing plaintiff's DMV records on four separate occasions, three of which with no permissible purpose. Each time Hart accessed the records, he was on-duty and used police computers to run the license plate through DMV. With plaintiff's personal information in hand – her name and address – the jury could reasonably infer that Hart

16

looked up her telephone records from another source such as the phone book.

There was also testimony that Hart made harassing telephone calls to other women that he ran DMV searches on but did <u>not</u> arrest. Tr. 285, 287, 366. The argument, which the jury could have accepted, was that it was Hart's pattern and practice to obtain a woman's name and address information from the DMV records, and to then use that information to look up her telephone number.

Accordingly, Hart's Rule 50 motion is denied.

**IV.     Rule 59 Motions for a New Trial or Remittitur**

Defendants also seek a new trial on various grounds, or, in the alternative, remittitur of the damages awards. I will first address whether the jury's verdict was seriously erroneous, a miscarriage of justice, or against the weight of the evidence such that a new trial should be conducted.

A. <u>Grounds for a New Trial</u>

The County first argues that the verdict was against the weight of the evidence as plaintiff failed to establish that Hart violated the DPPA or that he acted within the scope of his employment. These arguments have been discussed at length *supra,* and have been rejected. The more relaxed standard under Rule 59 does not alter my determination that the jury's verdict was supported by the evidence and was in no way egregious or seriously erroneous.

The County next argues that the verdict sheet should have allowed the jury to apportion damages between the County and Menghi, and to assess separate damages for each separate

violation of the DPPA.[4]   In support of its claim, the County has cited only the Third Circuit case of *Pichler v. UNITE,* 542 F.3d 380 (3d Cir. 2008).  I have reviewed that case and find that it does not interpret the DPPA to require the instruction requested by the County.

Defendants also challenge the admission at trial of evidence of Hart's computer searches for information on women other than Menghi.  Defendants claim that such evidence was highly prejudicial and inflammatory, and that its probative value was outweighed by its prejudicial effect.  They conclude that a new trial should be conducted, at which this evidence would be excluded.

The evidence at issue was admitted pursuant to Rule 404(b) of the Federal Rules of Evidence, which states that evidence of other crimes, wrongs, or acts, while "not admissible to prove the character of a person in order to show action in conformity therewith" may be admissible "for other purposes, such as proof of motive opportunity, intent, *preparation, plan,* knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b) (emphasis added).  The Second Circuit employs an  "inclusionary interpretation" of Rule 404(b) under which "similar act evidence is admissible 'so long as it is relevant and it is not offered to prove criminal propensity.'"  *Vilkhu v. City of New York*,  2009 WL 537495, at *2 (E.D.N.Y. Mar. 3, 2009) (quoting *United  States v. Pipola,* 83 F.3d 556, 565 (2d Cir.1996)).  Once the court has determined that the evidence is admissible under Rule 404 (b), it "must also scrutinize it under Rule 403 to determine if its probative value is substantially outweighed by the potential for unfair prejudice."  *United States v. Lekhtman*, 2010 WL 317871, at *2 (E.D.N.Y. Jan. 21, 2010)

---

[4]This argument was raised by the County for the first time *after* the charge had been read and the jury sent to deliberate. Tr. 830-31.

(citations omitted).

The contested evidence here implicated Hart's making of harassing telephone calls to four women in addition to plaintiff. Tr. 286-89. The evidence was offered and accepted under Rule 404(b), not to demonstrate Hart's criminal propensity for making such calls, but rather as proof of how Hart obtained the telephone numbers of his targets. Plaintiff sought to show that Hart's pattern was not to obtain telephone numbers incident to arrests, but rather by improperly accessing DMV records and using the personal information obtained thereby to look up telephone numbers. The Rule 404(b) evidence supported this theory by identifying women who were recipients of Hart's telephone calls and whose vehicle information was run through a DMV search, but who were not arrested. *See id*. 375-76. Accordingly, the information was relevant and not introduced for the purpose of establishing Hart's "criminal propensity." In addition, the court gave limiting instructions to the jury. *Id.* 289-90; 377. I conclude that introduction of this evidence does not warrant a new trial.

For the foregoing reasons, defendants' Rule 59 motion for a new trial on liability issues is denied.

## B. Excessiveness of Compensatory Damages

The defendants argue alternatively that the compensatory damages award should be reduced. "A district court may order a new trial limited to damages, or grant a remittitur by conditioning the denial of a defendant's motion for a new trial on the plaintiff accepting the reduction in damages, if the court finds that the damages awarded by the jury are excessive." *Lynch v. Town of Southampton*, 492 F. Supp. 2d 197, 204 (E.D.N.Y.,2007), *aff'd,* 2008 WL 5083010 (2d Cir. 2008). Remittitur has been described as "the process by which a court

compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984)). The decision of whether to grant a new trial is "committed to the sound discretion of the trial judge." *Lynch,* 492 F. Supp. 2d at 204 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992)). The court must apply the federal standard when assessing claims brought pursuant to federal law. "Under the federal rule, a court will not disturb a jury award unless it is so excessive as to shock the conscience of the court." *Gasperini v. Center for Humanities, Inc.,* 149 F.3d 137, 139-40 (2d Cir. 1998) (internal quotation and citations omitted).[5]

The jury awarded compensatory damages in the amount of $1,000,000. Plaintiff testified to emotional damages as well as post traumatic stress disorder ("PTSD") leading to Graves' disease. The defendants argue that the award is excessive and should be reduced to an unspecified amount. The County does not suggest that plaintiff has not presented evidence that supports any award, but rather that her evidence "falls far short of justifying such a significant award." County Mem. at 21. The County's contends that the jury compensated plaintiff "for having received 4 obscene phone calls over a period of approximately 3 years." *Id.* The County's enumeration of 4 calls, however, appears to be limited to the number of times the police prepared reports in response to a call from plaintiff. To the contrary, plaintiff testified that while she called the police every time she received a call, they did not always prepare a report. Tr. 448. Plaintiff testified to receiving calls on six separate dates over a three year period. *Id.*

_____

[5]The New York standard "is less deferential to the jury and thus more favorable to the party challenging the award than is the federal 'shocks the conscience' review." *Gasperini,* 149 F.3d at 140.

445-62.  Additionally, plaintiff testified that when she hung up the phone "he would call back every time, numerous times."  *Id.* 450.  On the first date alone, February 3, 1997, plaintiff testified that three calls were made.  *Id.* 445.  Thus, there was evidence before the jury that exceeded the County's characterization of "4 calls."

In determining whether a particular award is excessive, "courts normally look to 'other cases involving similar injuries, while bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" *Green v. City of New York*, 359 Fed.Appx. 197, 200 (2d Cir. 2009) (quoting *Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir. 1988)).  Since cases involving the DPPA are infrequent, I have looked to awards given for emotional damages in cases involving other federal causes of action.

Emotional distress claims in the employment discrimination context have been analyzed by categorizing the claims into three types  – "garden variety," "significant," and "egregious." *See Olsen,* 615 F. Supp. 2d at 46; *Khan v. HIP Centralized Lab. Servs., Inc.,* 2008 WL 4283348, at *10 (E.D.N.Y. Sept. 17, 2008); *Rainone v. Potter,* 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (citing Michelle Cucuzza, *Evaluating Emotional Distress Damage Awards to Promote Settlement of Employment Discrimination Claims in the Second Circuit,* 65 Brook. L. Rev. 393, 427-28 (1999)).  This framework has also been used to analyze emotional distress claims under §1983.  *See Thorsen v. County of Nassau,*  – F. Supp. 2d – , 2010 WL 2671816, at *11 (E.D.N.Y. June 30, 2010).  The analysis is not unlike that used in emotional distress cases under New York law, which differentiates between garden variety emotional distress claims that do not require medical attention and more complex claims resulting in a psychiatric injury.  *See Jessamy v. Ehren*, 153 F. Supp. 2d 398, 401 (S.D.N.Y. 2001).

In garden variety claims, the evidence of emotional harm "is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms." *Khan,* 2008 WL 4283348, at *11.  The next level, or "significant" emotional distress claims "differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.*  "Finally, 'egregious' emotional distress claims 'generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff.'" *Olsen,* 615 F. Supp. 2d at 47 (quoting *Khan,* 2008 WL 4283348, at *12).  Awards at the high end of the spectrum may be warranted "in cases that generally contain evidence of debilitating and permanent alterations in lifestyle." *Rainone,* 388 F. Supp. 2d at 124.

In addition, a claim for emotional distress goes beyond "garden variety" where the plaintiff suffers physical consequences of the emotional harm.  Particularly, aggravation of a medical condition can set plaintiff's claims apart from garden variety emotional distress.  *See, e.g., Epstein v. Kalvin-Miller Int'l, Inc.,* 139 F. Supp. 2d 469, 481 (S.D.N.Y. 2001) (plaintiff's emotional distress aggravated his heart disease and diabetes and declining to remit $54,000 award); *Shea v. Icelandair,* 925 F. Supp. 1014, 1022 (S.D.N.Y. 1996) (emotional pain and suffering from defendant's discriminatory conduct aggravated plaintiff's Parkinson's disease).

Based on the evidence presented, Menghi's emotional damages claims clearly exceed the "garden variety" claims in which the evidence "is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Bick v. City of New York,* 1998 WL 190283, at *25

(S.D.N.Y. Apr. 21, 1998). Plaintiff's testimony was neither vague nor conclusory. She testified about the nature of the harassing phone calls – the use of her name by the caller and the threat of rape. Tr. 444. She testified generally about the terror, desperation, and on one occasion, the fear that the caller was outside the house, that she experienced during the phone calls. *Id.* 448, 450, 462. She also testified about the changes in her behavior prior to the identification of Hart as the caller, such as questioning whether the caller was a co-worker or someone from the gym or anyone she came in contact with. *Id.* 452. In addition, she provided specific examples of her long-term injuries such as checking the doors, windows, and alarm constantly, sometimes five to ten times before going to bed. *Id.* 484-85. She won't go out at night or to the gym alone, *id.* 482-83, she doesn't like to leave the house, and is "petrified" about being pulled over by a police officer. *Id.* 486.

Plaintiff also provided evidence beyond her own testimony. Both her mother and her friend testified about the changes to her personality and behavior as a result of the events underlying this case. Plaintiff's mother, Joanne Menghi, testified that prior to the harassing telephone calls, plaintiff was a "full, fun person" who loved to go out, and was carefree and full of life. Tr. 634. Mrs. Menghi further testified that after the calls, plaintiff stayed home more and was alert all the time, *id.* 642, that plaintiff was fearful of being left alone, *id.* 645, and that the joy was gone. *Id.* 643. Plaintiff's longtime friend, Jamie Dochtermann, described plaintiff prior to the calls as "very outgoing, very social, life of the party, and a lot of fun to be around." *Id.* 624. She described her observations of Menghi as "very distraught" and "hysterical crying" during the time frame of the calls, and that plaintiff was more introverted and resisted going out because she was afraid of returning home after dark and that "somebody would be hiding in the

23

bushes." *Id.* 623-25. Ms. Dochtermann testified that the plaintiff was still affected and related a recent time when she observed plaintiff behaving fearfully, checking the house and garage locks, and verbally saying "the garage door is closed" to assure herself that the house was secure. *Id.* 626.

Her treating psychologist Dr. Abramson provided further support for her complaints. During her first visit to him, Menghi reported sleep disturbance, nightmares, depression, crying spells, panic attacks, feeling vulnerable, feeling tense when seeing police officers, and fear of being alone in the house. Tr. 138. He diagnosed her with PTSD, and found that the disorder was directly related to the harassing calls. *Id.* 131. Upon her return to treatment in 2007, Menghi reported mistrust of others, constant checking of doors to make sure they are locked, panic attacks, anxiety, vulnerability, fear of being alone, fear of strangers, fear of police officers, crying spells, and introversion. *Id.* 155. Dr. Abramson noted that despite the passage of time, she continues to suffer the same symptoms that are "quite persistent, chronic, pervasive, and affected the quality of her life." *Id.* 167. Ultimately, he testified that her prognosis is "not good," that this has been an "emotionally scarring experience," and that she will have residual anxiety for the rest of her life. *Id.* 167-68.

On the other hand, subsequent to the calls and the identification of Hart as the caller, plaintiff was apparently able to participate in a relationship that led to a second marriage, Tr. 427-28, and apparently has been able to maintain employment. *Id.* 430-32, 588.

As to the physical damages suffered by Menghi, Dr. Rosenthal testified that her Graves' disease was brought on by Hart's conduct. He further stated that Menghi must take Synthroid daily for the rest of her life and have blood tests every 4-8 weeks. Tr. 55. Menghi did not

attribute any extreme impact on her life to the Graves' disease, stating only that "it's something that I'll have to deal with. I'll have to have my blood checked all the time to make sure I'm on the right dosage. And at different times in life, different age change and different occurrences can make the dosage change which will cause side effects." *Id.* 517.

I find that while the evidence supports a finding that her claimed emotional damages are greater than "garden variety," they do not fall into the more extreme category of "egregious" and should thus be considered "significant." I further find that she established some physical damage as well.

Typically, courts in this Circuit "have routinely found that awards ranging from $100,00 to $500,000 are not excessive for significant emotional distress damages." *Thorsen,* –F. Supp. 2d –, 2010 WL 2671816, at *13 (collecting cases). An inability to work has been a factor in cases with awards in the $500,000 range. *See Ramirez v. New York City Off-Track Betting Corp.,* 112 F.3d 38, 41 n.1 (2d Cir. 1997) ($500,00 pain and suffering award in Title VII case was within court's discretion where plaintiff and his psychiatrist testified that plaintiff couldn't work and was "permanently non-functional"); *Komlosi v. Fudenberg,* 2000 WL 351414, at *17 (S.D.N.Y. Mar. 31, 2000) (awarding plaintiff $500,000 where no physical injury, but psychological injury was confirmed by physician and ability to practice his profession was destroyed), *aff'd,* 2002 WL 34244996 (2d Cir. 2002); *see also Marchisotto v. City of New York,* 2007 WL 1098678, at *3 (S.D.N.Y. Apr. 11, 2007) (award of $300,000 where in addition to evidence of PTSD, panic disorder, depression, anxiety, plaintiff was "too shattered" to return to his career), *aff'd,* 299 Fed.Appx. 79 (2008). However, there has been no evidence here that Menghi's ability to work has been impacted by the events underlying this case.

25

Higher awards have also been warranted where the emotional distress was accompanied by physical damages. *See Mathie v. Fries,* 121 F.3d 808 (2d Cir. 1997) ($250,000 award where plaintiff-prisoner was sexually assaulted by guard and suffered from PTSD including depression, anxiety, fear and disturbed sleep and evidence included testimony from plaintiff, his mother, and several health professionals); *Martinez v. Thompson,* 2008 WL 5157395, at *3, 8 (N.D.N.Y. Dec. 8, 2008) (award of $500,000 in §1983 excessive force case where plaintiff suffered from PTSD including nightmares, fear of law enforcement officials, anxiety, depression, but also had physical injuries including broken rib, chronic headaches). Menghi provided evidence of a physical component to her damages, i.e., the development of Graves' disease.

The case that presents the greatest similarities in the type of emotional distress alleged is *Sulkowska v. City of New York*, 129 F. Supp. 2d 274 (S.D.N.Y. 2001). In *Sulkowska,* plaintiff claimed that she was falsely arrested and imprisoned. As to her emotional damages, plaintiff testified to constant fear that someone is trying to kill her and "never goes to bed without checking all the doors and looking in corners, under the bed, and in the closet." *Id.* at 306. Her psychologist testified that she suffered from PTSD and that she was fearful of police, had feelings of helplessness, and difficulty sleeping. *Id.* at 305. In addition, the award was appropriate even though the plaintiff had outside sources of stress, such as depression related to the death of her husband and her own surgery for a brain tumor, and there was no evidence that she could no longer work. *Id.* at 304. The Court concluded that plaintiff was severely, if not permanently, injured, and awarded her $275,000. *Id.* at 308-09. That 2001 award, adjusted for inflation, would be valued at approximately $334,000 at the time of the verdict in this case. *See* CPI Inflation Calculator, U.S. Bureau of Labor Statistics,

http://www.bls.gov/data/inflation_calculator.htm. *See also Phillips v. Bowen,* 278 F.3d 103, 111-12 (2d Cir. 2002) ($400,000 award not excessive where plaintiff, boyfriend, and co-workers testified to her emotional distress, physical illness, and effects on her lifestyle and relationships); *Olsen,* 615 F. Supp. 2d at 47-49 (upon testimony of three plaintiffs along with their health professionals, sustaining jury awards of $500,000 for depressive neurosis, anxiety, avoidance of friends and family, weight fluctuations, sleep issues, rapid heart beat, and migraines, $400,000 for anxiety disorder, stress related chest pains, migraines, and feelings of helplessness, $100,000 for feelings of anger, depression, and helplessness, adjustment disorder).

Based on my review of the cases as well as the evidence presented at the trial in this case, I find that an award of $1,000,000 falls well beyond the maximum award for the emotional damages suffered by plaintiff. Accordingly, there will be a new trial on compensatory damages unless Menghi agrees to a reduction to the sum of $500,000.

C.  Excessiveness of Punitive Damages

The jury also awarded plaintiff $2,000,000 in punitive damages against Hart. Punitive damages "operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 432 (2001). However, "[a] punitive damages award will not be upheld where it is so grossly excessive that it 'furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 564 (S.D.N.Y. 2008) (citations omitted).

It cannot be seriously argued there is insufficient evidence to support a finding that Hart's behavior was reprehensible. *See BMW of North America v. Gore,* 517 U.S. 559, 574-75 (1996).

27

He maliciously, explicitly and repeatedly threatened Menghi over the telephone, and it can be argued that if anything, the length of time between his calls induced a greater level of terror in his victim than if they had occurred over a shorter time span. Nonetheless, even though Hart's actions were reprehensible and "a defendant's conduct is obviously germane to the damages issue, 'even outrageous conduct will not support an oppressive or patently excessive award of damages.'" *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (quoting *Brink's Inc. v. City of New York,* 546 F. Supp. 403, 413-14 (S.D.N.Y.1982) (citations omitted)).

While an award of punitive damages is warranted, the court must still consider Hart's financial circumstances in assessing the amount. One purpose of punitive damages is deterrence and "deterrence is directly related to what people can afford to pay." *Lee v. Edwards,* 101 F.3d 805, 813 (2d Cir.1996). The Second Circuit has indicated that it will not "affirm punitive damages awards that 'result in the financial ruin of the defendant' or 'constitute a disproportionately large percentage of the defendant's net worth.'" *Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006) (quoting *Vasbinder,* 976 F.2d at 121).

In *Patterson,* the Second Circuit determined that a punitive damages award of $10,000 was appropriate where the defendant had an annual salary of approximately $37,000, owned a home that he had refinanced for $87,000, bank accounts totaling approximately $470, $5,000 in debt, and responsibility for two children. *Patterson,* 440 F.3d at 122-23. In *Vasbinder,* the Second Circuit addressed the financial circumstances of two individual defendants against whom the jury had awarded punitive damages awards of $150,000 each. *Vasbinder,* 976 F.2d at 118. One such award was reduced to $20,000 where the defendant had a net worth of $270,000 including home equity, an annual salary of $75,000, and annual pension of $29,000. The other

award was reduced to $30,000 where the original $150,000 award would "consume" more than 30 percent of that defendant's net worth and over 40 per cent of his liquid assets. *Id.*

Hart testified that at the time of the trial, he worked in a factory making $10.00 per hour. Tr. 342:9. Based on that number and using a forty hour work week, Hart's annual salary, before taxes or a single expense, would be $20,800. Hart did not submit any additional evidence regarding his financial circumstances, either at trial or in support of his motion. In her opposition to Hart's motion, plaintiff did not address Hart's ability to pay. However "under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'" *Mathie*, 121 F.3d at 816 (quoting *Lightning Bolt Prod.,* 861 F.2d at 373).

Although Hart's conduct was contemptible and should in no way be trivialized, an award of punitive damages in the amount of $2,000,000 against him is clearly excessive and must be reduced. Based on the evidence presented, the punitive damages award is reduced to $100,000 and a new trial on damages will be held if plaintiff does not agree to the remittitur.

**V. Attorneys' Fees and Costs**

The DPPA provides for an award of "reasonable attorneys' fees and other litigation costs reasonably incurred." 18 U.S.C. §2724 (b)(3). Plaintiff's counsel, Dan DeVita seeks an award of attorneys' fees in the amount of $257,647, taxable costs in the amount of $8,549.25, and discretionary costs in the amount of $11,814.30. *See* DE [166]. The County has submitted opposition to the request, *see* DE [179], and Hart has submitted a one-page document joining in the County's motion. *See* DE [180].

A. Appropriateness of Attorneys' Fee Award

The County first argues that the court should exercise its discretion and decline to make any award of attorneys' fees and costs against it. In the alternative, the County suggests that any award should be "fixed commensurate with its degree of liability herein, if any." County Mem. in Opp. at 4. It also contends that it should not be liable for attorneys' fees for any actions taken by defendant Hart. The County's argument apparently rests solely upon its contention that it cannot be vicariously liable under the DPPA. As the court has already determined that issue to the contrary, *supra,* I need not revisit it in this context.

The County next argues that no fees may be awarded for services rendered in pursuit of the ultimately unsuccessful §1983 claims. Plaintiff's counsel acknowledges that this is an issue, but argues that the §1983 claims and DPPA claims "are intertwined an arise for the same core of facts." Pl. Mem. at 9, DE [167]. *See Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1999) (noting that an award of attorneys' fees may be made for both successful and unsuccessful claims where the facts are "inextricably intertwined" and involve a common core of facts). I find that the claims arose from the same set of facts and thus parsing out the claims which were ultimately unsuccessful is neither feasible nor appropriate.

B. Determination of Attorneys' Fees

Having decided that an award of attorneys' fees is warranted, I turn to a determination of that award. Plaintiff's counsel seeks recovery of the following attorneys' fees, including supplemental fees sought for preparing responses to post-trial motions:

|  | HOURS | RATE | Total |
|---|---|---|---|
| Attorney: | 960.40 | $295.00 | $283,318.00 |
| Attorney travel: | 35.80 | $147.50 | 5,280.50 |

| Paralegal: | 28.8 | $80.00 | 2,304.00 |
| Paralegal travel: | 3.30 | $40.00 | 132.00 |
| TOTAL: | | | **$291,034.50** |

When assessing the reasonableness of legal fees, the court must determine the "presumptively reasonable fee" for an attorney's services by looking to what a reasonable client would be willing to pay, keeping in mind that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 189-90 (2d Cir. 2008)(internal citations omitted). In order to calculate the presumptively reasonable fee, the court must first determine a reasonable hourly rate for the legal services performed. *Id.* Reasonable hourly rates in attorney fee awards are determined with reference to a number of factors, including but not limited to those factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). *See Arbor Hill,* 522 F.3d at 186-87, 190. The *Johnson* factors, as articulated by the court in *Arbor Hill,* are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitation imposed by the client or the circumstances; (8) the amount involved in the case and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." 522 F.3d at 186, n.3 (citing *Johnson,* 488 F.2d at 717-19). Those factors are to be considered within the context of the relevant legal "community," traditionally defined as "the district where the

district court sits." *Id.* at 190 (internal citation omitted).

Plaintiff's attorney, Daniel DeVita, has submitted a detailed declaration in support of the fee application. Noting that the DPPA claim is "an amalgam of various types of claims" with characteristics of civil rights claims, tort claims, and discrimination claims, Mr. DeVita submits that a presumptively reasonable rate would be $295 per hour for his time and $80 per hour for paralegal work. The County "does not suggest that the hourly rate requested by plaintiff is presumptively unreasonable," but urges the court to use its discretion to set a lower rate. County Opp. at 12, DE [179-7]. Based upon the two cases cited by the County, it apparently believes a rate of $250 per hour to be more appropriate. The County does not indicate whether it challenges the paralegal hourly rate of $80.00 sought by plaintiff's counsel.

Examination of the *Johnson* factors supports a finding that the hourly rate sought by plaintiff's counsel is reasonable. The case was labor intensive, requiring extensive discovery and significant motion practice, including a contested motion to amend and opposition to defendants' motions for summary judgment. The novelty and difficulty of the questions presented by the DPPA claim and the issue of vicarious liability further support the requested hourly rate. As the *Johnson* court noted, an attorney "should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." *Johnson,* 488 F.2d at 718. Moreover, as a sole practitioner, the substantial time required on this case precluded Mr. DeVita from expanding his practice. *See* DeVita Decl. ¶15, DE [166] (stating that "[b]ecause of the factual and legal difficulty and complexity of this case, it necessarily limited my ability to grow my practice"). Mr. DeVita also stated that the $295 hourly rate sought here is consistent with his customary rate, DeVita Decl. ¶¶7-8, and that

although he represents Ms. Menghi on a contingency basis, "one hundred percent of any amounts collected under this fee award application will go directly to plaintiff to reimburse her for the contingency fee payment." *Id.* ¶16. Additionally, counsel obtained a substantial jury verdict and damages award for his client.

As to counsel's experience and ability, at the time of the trial, Mr. DeVita had over 20 years experience, including significant litigation experience in both public and private practice. *See* DeVita Aff. ¶¶3-5. In the seven years leading up to the trial, he was a sole practitioner representing clients in commercial litigation, civil rights litigation, and employment discrimination cases.[6] *Id.* I note that his conduct of this case was professional and exceedingly competent. He obtained a good result for his client in a difficult case with unusual legal issues.

The final *Johnson* factor is awards in similar cases, which factor also supports the requested hourly rate of $295. *See Luca v. County of Nassau*, 698 F. Supp. 2d 296, 305 (E.D.N.Y. 2010) (noting prevailing Eastern District rates of $300-400 for partners, $200-250 for senior associates, and approving rate of $275 for solo practitioner acting in of counsel role); *Century 21 Real Estate, LLC v. Bercosa Corp.,* 666 F. Supp. 2d 274, 299 (E.D.N.Y. 2009) (approving hourly rates of $320 for partner, $230 for associate); *Gutman v. Klein*, 2009 WL 3296072, at *2 (E.D.N.Y. Oct. 13, 2009) (acknowledging going hourly rates of $300 to $400 for

---

[6]While the size of the firm may be a consideration, "courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner" and "[o]verhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate." *McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund,* 450 F.3d 91, 98 n.6 (2d Cir.2006); *see also Kauffman v. Maxim Healthcare Servs., Inc.*, 2008 WL 4223616, at *9 (E.D.N.Y. Sept. 9, 2008); *Alveranga v. Winston,* 2007 WL 595069, at *8 (E.D.N.Y. Feb. 22, 2007) (awarding hourly rates of $250 and $185 to sole practitioners with 27 years and 5 years of experience, respectively).

partners, $200 to $300 for senior associates, and $100 to $200 for junior associates).

Based on my examination of all the factors, I find that the hourly rate of $295 for Mr. DeVita is reasonable. As to the paralegal rate of $80, however, Mr. DeVita gives no information about the person who performed those services. As such, it is impossible to determine whether the rate was presumptively reasonable. In addition, while few hours, 32.1, are attributed to the unnamed paralegal, the services described are largely ministerial, such as copying and compiling pleadings and motion papers. Typically, in this Circuit, "clerical and secretarial services are part of overhead and are not generally charged to clients." *Sulkowska,* 170 F. Supp. 2d at 368-69 (citations omitted). Plaintiff's counsel has provided no detail to suggest that the tasks performed here required particular training. *See, e.g., Guardado v. Precision Fin., Inc.,* 2008 WL 822105, at *6 (E.D.N.Y. Mar. 25, 2008) (allowing award where work of administrative assistant found to be "more akin" to paralegal work). As no particular skill set is required for those activities, I find that they are administrative costs that need not have been performed by a professional or billed separately, and thus I decline to award those fees.

As required by *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir. 1983), plaintiff's counsel has submitted contemporaneous billing records setting forth the date and amount of time when services were rendered and a description of the services performed. In reviewing the fees sought, it is clear that the court "should exclude excessive, redundant, or otherwise unnecessary hours." *Quaratino,* 166 F.3d at 425. While the court could subtract particular entries, "the Second Circuit has stated that the district court is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items.'" *Alveranga,* 2007 WL 595069, at *5 (quoting *Lunday v. City of Albany,*

42 F.3d 131, 134 (2d Cir. 1994)).  In addressing excessive hours spent, "the court may make reductions to individual entries, or elect to account for such over-billing in an across-the-board percentage deduction."  *Manzo v. Sovereign Motor Cars, Ltd.,* 2010 WL 1930237, at *8 (E.D.N.Y. May 11, 2010) (citing *Luciano v. Olsten Corp.,* 109 F.3d 111, 117 (2d Cir. 1997)(citation omitted)).

Turning to a review of the hours expended, I note that this case was both lengthy and hard-fought.  There were discovery disputes, motions for default judgment and to amend the complaint, opposition to defendants' summary judgment motions, trial preparation, trial, and post-trial proceedings.  Most of these battles resulted in at least partial victories for the plaintiff.  In addition, the case presented novel questions of law that may have required additional research and expertise.  That being said, the hours expended do appear somewhat excessive.  For example, while I found above that the §1983 claims and DPPA claims were inextricably intertwined, I note that the DPPA claims were not part of the original complaint and thus there is an argument that time billed prior to the amendment should not be recoverable.  Pre-amendment time billed could, however, contribute to counsel's determination that a viable DPPA claim existed.  Rather than determine the extent to which fees should be awarded for a particular entry, I have considered this scenario in my determination that the fees should be reduced on a percentage basis.  In addition, the lack of specificity in some entries may warrant some reduction in the requested fee.  *See Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC,* 549 F. Supp. 2d 274, 284 (E.D.N.Y. 2008).[7]

---

[7]The County points to the discrepancy between the hours billed by its attorneys, 520.7, and those for which plaintiff's counsel seeks payment, 960.4, and suggests that "competent and successful representation could be provided in significantly fewer hours."  County Opp. at 13.  It

After reviewing the evidence submitted by the parties, and based on my familiarity both with the prevailing rates in this district and with the work performed in this particular case, I find that a reduction of 20% of the fee sought is appropriate. Removing the fees for paralegal work, the total fee sought is $288,598.50. Applying the reduction, I conclude that the resulting fee of $230,878.80 is presumptively reasonable.

### C. Costs

In addition to attorneys' fees, plaintiff seeks recovery of taxable costs under the federal rules and this court's local rules. *See* Fed. R. Civ. P. 54 (d); Local Civil Rule 54.1. Local Civil Rule 54.1 (a) clearly provides that "[c]osts will not be taxed during the pendency of any appeal." As the County has noticed its appeal, plaintiff's motion is denied without prejudice to renew until after final disposition of the appeal.

Plaintiff also seeks recovery of costs "not covered by the local rule that are other litigation costs reasonably incurred" and thus recoverable under the DPPA. Pl.'s Mem. at 13. Specifically, plaintiff seeks to recover the following:

| | |
|---|---|
| Expert Witness fees – Dr. Abramson | $3,122.50 |
| Expert Witness fees – Dr. Rosenthal | $7,610.00 |
| Process server fees | $293.10 |
| Non-taxable cost deposition transcripts | $788.70 |
| TOTAL | **$11,814.30** |

The County argues that to the extent plaintiff seeks recovery for expert witnesses, such costs are

does not, however, offer any legal support suggesting what weight, if any, the court should give to this information.

not recoverable as they are not explicitly authorized by the DPPA.

The DPPA provides that, in addition to attorneys' fees, the plaintiff may recover "other litigation costs reasonably incurred." 18 U.S.C. 2724 (b)(3). Although the plaintiff cites cases in which expert witness fees are awarded as a cost, those cases make the award without discussion. The Supreme Court has directed that "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." *Crawford Fitting Co. v. J. T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 297 (2006) (in IDEA case, declining to interpret "costs" to mean all costs incurred including expert fees); *West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83 (1991) (superseded by statute). Plaintiff has not provided any legal authority to address the principle that if Congress intended to allow recovery of expert witness fees, it should have explicitly provided for that recovery in the statute. Accordingly, plaintiff's motion for discretionary costs is denied as to full recovery of the expert witness costs, and granted as to the remaining costs.

## CONCLUSION

Defendants' motions under Rule 50 are denied. Defendants' motions under Rule 59 are granted to the extent that there will be a new trial on damages unless Menghi agrees to the reduction of her compensatory damages to $500,000. In addition, defendant Hart's motion is granted to the extent that there will be a new trial on punitive damages unless Menghi agrees to the reduction of her punitive damages to $100,000. Plaintiff's counsel shall, within twenty days of the entry of this order, provide the court with written notice of whether plaintiff has decided to accept the remittitur of both the compensatory and punitive damages awards. The Rule 59

motions are denied in all other respects.  Plaintiff's motion for attorneys' fees and costs is granted in the amount of 230,878.80 and $1,081.80, respectively.


Dated:   Central Islip, New York                    **SO ORDERED**
                 September 30, 2010


                                                          /s/ William D. Wall
                                                          WILLIAM D. WALL
                                                          United States Magistrate Judge